# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

PITTSBURG COUNTY RURAL
WATER DISTRICT NO. 7, an agency
and legally constituted authority of the
State of Oklahoma,

    Plaintiff-Appellant,

v.

CITY OF McALESTER, a
municipality, and THE McALESTER
PUBLIC WORKS AUTHORITY, a
public trust,

    Defendants-Appellees.

and

KENNETH W. SHERILL; LINDA F.
SHERILL; BAR-19; HUNTSMAN
EDISON FILMS CORPORATION,
successor to Blessing Corp., d/b/a
Edison Plastics; MIG, INC.;
SOUTHEAST OKLAHOMA BOX
COMPANY; TRI-CAT, INC.;
SIMMONS POULTRY FARMS, INC.;
DENNIS DEFRANGE; TERRY
KINYON; PITTSBURG COUNTY
REGIONAL EXPOSITION
AUTHORITY; THE BOARD OF
COUNTY COMMISSIONERS OF
THE COUNTY OF PITTSBURG; H.

No. 02-7080

G. GILLIAM; BILL WEBBER; OBEN
WEEKS; THUNDERCREEK GOLF
COURSE TRUST AUTHORITY,

Defendants.

**ORDER**
Filed February 6, 2004

Before **HENRY**, **HOLLOWAY**, and **MURPHY**, Circuit Judges.

The parties' petitions for rehearing and for rehearing en banc are denied, except with regard to the "internal inconsistency," see Appellee's Pet. for Reh'g at 8-9 n.5, regarding the description of "Group 3" customers in the panel opinion. See Pittsburg County Rural Water Dist. No. 7. v. City of McAlester, 346 F.3d 1260, 1270, 1277 (10th Cir. 2003). With regard the discussion of "Group 3" customers, the court now clarifies the panel opinion as follows:

> The district court's holding that "[w]hen a municipality is serving water to a property prior to a water district's FMHA loan date, the rural water district has no right to serve water to that property, and thus, no 1926(b) protection," see id. at 1277 (quoting Aplt's App. at 1101), did not concern "Group 3" customers
> Instead, that district court ruling concerned customers served by McAlester prior to the date of the 1994 FMHA loan. It is as to those customers that the panel held: "all § 1926 claims based on service by McAlester to customers within the limitations period were not otherwise barred by the fact that McAlester was serving those customers prior to the 1994 loan." Id. at 1277.

The amended opinion reflecting this clarification is attached.

Entered for the Court,
Patrick Fisher, Clerk

By:
      Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 6 2004**

**PATRICK FISHER**
**Clerk**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

PITTSBURG COUNTY RURAL
WATER DISTRICT NO. 7, an agency
and legally constituted authority of the
State of Oklahoma,

     Plaintiff-Appellant,

v.

CITY OF McALESTER, a
municipality, and THE McALESTER
PUBLIC WORKS AUTHORITY, a
public trust,

     Defendants-Appellees.

and

KENNETH W. SHERRILL, LINDA F.
SHERRILL, CITY OF McALESTER,
BAR-19, BLESSING CORP., d/b/a
EDISON PLASTICS, MIG, INC.,
SOUTHWEST OKLAHOMA BOX
COMPANY, TRI-CAT, INC.,
SIMMONS POULTRY FARMS, INC.,
DENNIS DeFRANGE, TERRY
KINYON, PITTSBURG COUNTY
REGIONAL EXPOSITION
AUTHORITY, THE BOARD OF
COUNTY COMMISSIONERS OF
THE COUNTY OF PITTSBURG,
H.G. GILLIAM, CHAIRMAN BILL
WEBBER, OBEN

No. 02-7080

WEEKS, and THUNDERCREEK
GOLF COURSE TRUST
AUTHORITY,

Defendants.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
D.C. NO. CIV-97-185-P**

---

Michael D. Davis (Steven M. Harris with him on the briefs), Doyle, Harris, Davis & Haughey, Tulsa, Oklahoma, for Plaintiff-Appellant.

James C. Milton (Linda C. Martin, Doerner, Saunders, Daniel & Anderson, L.L.P., Tulsa, Oklahoma, and Wesley Brown, Brown & Brown, McAlester, Oklahoma, with him on the brief), Doerner, Saunders, Daniel & Anderson, L.L.P., Tulsa, Oklahoma for Defendants-Appellees.

---

Before **HENRY**, **HOLLOWAY**, and **MURPHY**, Circuit Judges.

---

**HENRY**, Circuit Judge.

---

The Pittsburg County Rural Water District Number 7 (Pitt-7) is a rural county water association in Oklahoma. The City of McAlester (McAlester) is a municipality in Oklahoma. Both Pitt-7 and McAlester are subdivisions of the State of Oklahoma, and both are water providers. Pitt-7 sued McAlester and a number of other entities under: (1) 42 U.S.C. § 1983, based on the claim that the defendants violated Pitt-7's exclusive right under 7 U.S.C. § 1926 to provide

-2-

water to customers within the protected area; (2) federal antitrust law; and (3) state antitrust law. The district court, faced with a difficult set of issues, granted summary judgment for the defendants on certain § 1926 claims, dismissed certain other § 1926 claims, and dismissed Pitt-7's federal and state antitrust claims. For the reasons detailed below, we affirm in part, reverse in part, and remand.

## I. BACKGROUND

**A.     7 U.S.C.  § 1926**

In 1961, Congress amended 7 U.S.C. § 1926(a) to authorize the United States Farmer's Home Administration (FMHA) to make loans to nonprofit water service associations for "the conservation, development, use, and control of water."[1] Congress enacted 7 U.S.C. § 1926(b), in turn, to govern the terms of federal loans made to those associations. Section 1926(b) provides that, for an association indebted by a loan to the federal government under the statute, "[t]he service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting

---

[1] FMHA loans are now administered by the United States Department of Agriculture. See Pub. L. No. 103-354 (1994)). For the sake of simplicity, we refer to the creditor entity as the FMHA throughout the opinion.

of any private franchise for similar service within such area during the term of such loan." 7 U.S.C. § 1926(b).

**B.     The Board of County Commissioners of Pittsburg County, Pitt-7, the Loan from the FMHA, and McAlester**

In 1963, Oklahoma lawmakers responded to Congress's 1961 amendment of 7 U.S.C. § 1926 by enacting a statute that "authorizes rural water districts to borrow money from the federal government to accomplish the purposes for which they are established." Sequoyah County Rural Water Dist. No. 7 v. Town of Muldrow, 191 F.3d 1192, 1194 (10th Cir. 1999) (citing Okla. Stat. Ann. tit. 82, § 1324.10(A)(4)). In 1966, the Board of County Commissioners of Pittsburg County, Oklahoma (importantly, as will be seen later, an entity distinct from Pitt-7), incorporated Pitt-7 to "develop[ ] and provid[e] an adequate rural water supply . . . to serve and meet the needs of rural residents within the territory of the district." Okla. Stat. Ann tit. 82, § 1324.3.

In 1967, Pitt-7 first took advantage of the availability of the federal loans by borrowing $300,000 from the FMHA. Pitt-7 remained continuously indebted to the FMHA until February 24, 1989, when Pitt-7 repurchased its outstanding debt to the FMHA. On June 15, 1994, Pitt-7 once again entered into a loan agreement with the FMHA, borrowing $162,500. See Aplt's App. at 1005 (Mortgage, dated June 15, 1994).

From its inception, Pitt-7's territory included both land within McAlester's territorial limits and land near, but outside of, McAlester's territorial limits. For nearly three decades through June 30, 1999, Pitt-7 serviced these portions of its area with water purchased from McAlester. During the 1980s and 1990s, the relationship between Pitt-7 and McAlester became increasingly strained, apparently due to Pitt-7's demands that McAlester stop selling water in areas over which Pitt-7 held an exclusive service right under § 1926, McAlester's refusal to comply, and McAlester's threats to terminate water sales to Pitt-7.

**C.  The Complaint, the Petition for Deannexation, and the Termination of Water Sales by McAlester to Pitt-7**

On March 25, 1997, Pitt-7 filed this action in federal district court, alleging violations of 7 U.S.C. § 1926(b) as enforced through 42 U.S.C. § 1983, federal antitrust law, and various Oklahoma state laws, including antitrust. McAlester responded in two ways.

First, on May 12, 1997, more than six weeks after Pitt-7 had filed this action, McAlester, several other local government entities, and landowners within Pitt-7's territory petitioned the defendant-appellee Pittsburg County Board of

County Commissioners to deannex a portion of Pitt-7's territory.[2]  The deannexed properties included those properties previously designated for service by Pitt-7 that are disputed in this case: Industrial Park, the Pittsburg County Regional Exposition Center, the Thundercreek Golf Course, the Sherrill property, and the Fender residence.  The petitions documented complaints by McAlester and by landowners within Pitt-7's territory concerning customer service, capacity, and pricing.  Pitt-7 moved before the Board to strike the petitions on the grounds that federal law – specifically § 1926 –  preempted the requested deannexation.

Second, in June 1998, the McAlester City Council passed a motion instructing that Pitt-7 "be given written notice by the City Manager that effective June 30, 1999, the City Council would no longer enter into a contract for the purpose of selling water to them."  Aplt's App. at 437 (Minutes of McAlester City Council Session, dated June 23, 1998).  As of June 30, 1999, McAlester terminated water sales to Pitt-7.

---

[2] Oklahoma law provides a mechanism for county commissioners to release designated lands from a water district.  Under 82 Okla. Stat. tit. 1991, § 1324.21, "fifty-one percent . . . of the affected landowners may petition the county commissioners to release those lands from the district."  Upon review of that petition, if the Board of County Commissioners determines that "the granting of the petition is to the best interests of the affected landowners and the affected district," id., then the designated lands are released, or "deannexed" from the water district's territory.

**D. The Deannexation Order and the Resulting Decisions by the Oklahoma District Court and the Oklahoma Court of Civil Appeals**

In June 1997, after a hearing at which counsel for Pitt-7 and for the petitioners each argued its side of the question, the Board voted to enter a Deannexation Order, stating that "it is in the best interests of the landowner, and in the best interest of [Pitt-7], that such lands be released from [Pitt-7]." Aples' Supp. App. at 355 (Certificate Releasing Lands from Rural Water Dist. No. 7, Pittsburg County, Oklahoma, dated Jun. 27, 1997). The Deannexation Order did not address the legality of the deannexation under federal law.

Under Oklahoma law, "an appeal lies from an order of the Board of County Commissioners to the District Court whenever their orders or decisions are of a judicial or quasi judicial nature." Chandler Materials Co. v. Bd. of County Comm'rs of Tulsa County, 254 P.2d 767, 770 (Okla. 1953). Pitt-7 appealed the deannexation to the Oklahoma District Court in Pittsburg County, which exercised jurisdiction over the appeal and then dismissed the appeal as not properly perfected on the ground that Pitt-7's service upon the Pittsburg County Board of County Commissioners was "not sufficient" under Oklahoma law. Aples' Supp. App. at 459 (Order of the Oklahoma District Court for Pittsburg County, dated Sept. 15, 1997).

Pitt-7 then appealed the Oklahoma District Court's ruling to the Oklahoma Court of Civil Appeals (OCCA). The OCCA initially stated that "the

deannexation decision at issue here . . . clearly determines land use and is a legislative function. It therefore follows that the trial court was without jurisdiction to hear Pitt-7's appeal." Aples' Supp. App. at 252 (Memorandum Opinion No. 90,114, dated May 19, 1998).

Though the prevailing party, McAlester filed a Petition for Rehearing in the OCCA. The OCCA granted the petition, vacated its initial opinion, and held that the Oklahoma district court *did* properly exercise jurisdiction over Pitt-7's appeal, reasoning that "[a]s a neutral tribunal whose decision affects the legal relation of particular lands vis-a-vis a corporate body, the board of county commissioners acts in a judicial or quasi-judicial capacity." Id. at 209 (Opinion on Rh'g, dated Sept. 8, 1998). The OCCA further held – with no discussion – that "the decision of the Board of County Commissioners releasing lands from the water district . . . is final and binding on [Pitt-7] even if based on an erroneous application of federal law" and that "[i]t is not subject to collateral attack or an equitable challenge, such as declaratory relief." Id. at 210. The OCCA therefore affirmed the trial court's dismissal. Id. Pitt-7's subsequent petition to the Oklahoma Supreme Court for a writ of certiorari was denied.

**E.     The First Amended Complaint, the Various Motions Filed in the District Court, and the District Court's Orders**

Meanwhile, Pitt-7's federal district court action remained pending.  In May 1997, Pitt-7 filed a motion in the federal district court for partial summary judgment.  In June 1997, while the proceeding before the Board was pending, Pitt-7 filed a First Amended Complaint in federal district court, adding as defendants the groups that had petitioned for deannexation and the Board of County Commissioners and also challenging the prospective deannexation.  See Aplt's App. at 71-89 (First Amended Complaint, dated June 2, 1997).  Subsequently, McAlester and the other defendants filed a series of motions for partial summary judgment and motions to dismiss.

Between November 1997 and September 1998, the federal district court issued a series of dispositive orders adjudicating the motions in favor of the defendants, ultimately either dismissing or granting summary judgment against Pitt-7 on all of Pitt-7's claims.  See Aplt's App. at 143 (Judgment of the United States District Court, filed Oct. 15, 1998).  Two of the district court's holdings in these orders are relevant to this appeal.

First, the district court examined the impact of Pitt-7's repurchase of its debt in 1989 and determined that any protections afforded Pitt-7 under § 1926(b) were extinguished along with its indebtedness to FMHA.  Because Pitt-7

became indebted to FMHA again in 1994, the district court decided that the only viable claims at issue arose from actions taken by McAlester after June 15, 1994.

Second, the district court assessed whether Pitt-7 had made service "available" under § 1926. The district court found that Pitt-7 had "water lines in proximity to the properties," Aplt's App. at 139 (District Court Order, dated Sept. 30, 1998), but that Pitt-7 "must also demonstrate that the lines in place are of sufficient capacity to handle the water needs of the customers to be served at the present time." Id. "With each property referenced," found the district court, "Pitt-7 will require the customer to pay for an extension to its existing water lines in order to provide service." Id. Based on these findings, the district court determined that Pitt-7 "has not made service available to the disputed areas and is, therefore, not entitled to § 1926(b) protection." Id. at 140.

**F.     This Court's May 22, 2000 Order & Judgment**

On Pitt-7's appeal of the district court's orders, a unanimous panel of this court reversed. See Pittsburg County Rural Water Dist. No. 7 v. City of McAlester, No. 98-7148, 2000 WL 525942 (10th Cir. May 2, 2000). In an Order & Judgment, we held that the fact that Pitt-7's debt was satisfied in 1989 did not extinguish otherwise valid claims for violations of Pitt-7's § 1926 rights during the period of indebtedness. We stated that to hold otherwise "'would defeat the

-10-

purpose of [§ 1926(b)] because a water association which repurchased . . . its debt but which otherwise met the statutory requirements would have no recourse for encroachments that occurred or began while it was indebted to the government.'" Id. at **3 (quoting Sequoyah, 191 F.3d at 1200) (brackets and ellipses in original). We also held that the district court employed the test for determining whether Pitt-7 had made service "available" in "an inappropriately restrictive manner" because the district court did not consider service that could have been made available in a reasonably short time. Id. at **4. The Order and Judgment declined to reach an array of issues, including the question of whether Pitt-7's § 1926 rights over the deannexed territory survived the deannexation, and remanded the case "for further proceedings consistent with this Order and Judgment." Id. On remand, the case was reassigned by the United States District Court for the Eastern District of Oklahoma to a different district court judge (from Burrage, J. to Payne, J.).

### G. The Second Amended Complaint

In January 2001, Pitt-7 filed a Second Amended Complaint. The Second Amended Complaint summarized the proceedings before the Pittsburg County Board of County Commissioners, the state court, the federal district court, and this court, and added the now finalized deannexation to the items complained of

in the suit. The Second Amended Complaint alleged causes of action for violation of: (1) 42 U.S.C. § 1983 under 7 U.S.C. § 1926; (2) federal antitrust laws; and (3) state antitrust laws. As for remedies, the Second Amended Complaint sought a declaratory judgment on the City's right to sell water in Pitt-7's territory, a declaratory judgment clarifying the various interested parties' rights and legal relations, multiple injunctions relating to the land areas deannexed, an injunction requiring McAlester to provide water to Pitt-7, and a declaratory judgment stating that the deannexation was unlawful.

## H.    The District Court's Order on Remand

On June 7, 2002, the district court issued an order rejecting all of Pitt-7's claims. That order granted summary judgment for McAlester and the other defendants on Pitt-7's § 1983 claims based on the alleged violation of 7 U.S.C. § 1926 and dismissed Pitt-7's claim for injunctive relief under § 1926, federal antitrust, and Oklahoma antitrust law. For purposes of understanding the district court's order, the water customers consist of three groups:

Group 1:    those customers McAlester first served during the first period of indebtedness, July 3, 1967 to February 24, 1989;

Group 2:    those first served between February 24, 1989 and June 15, 1994, when Pitt-7 was not in debt to the federal government;

-12-

Group 3:      those first served after the June 15, 1994 federal loan, when Pitt-7 incurred its latest debt to the federal government.

Regarding Group 1 customers, the district court concluded that Pitt-7's § 1926 claims involving those customers were time-barred. The district court reasoned that a two-year statute of limitations applied and that since the "instant case was filed March 25, 1997 . . . all alleged encroachments occurring prior to March 25, 1995 are barred by the statute of limitations." Id. at 1101-02 (Dist. Ct. Order, filed June 7, 2002, at 5.). As discussed below, we affirm this conclusion.

Regarding **the other customers**, the district court found that all properties on which McAlester was serving water as of the beginning of the period (all but one of the properties at issue) "do not fall within [Pitt-7's]§ 1926(b) protected territory." Id. at 1101 (Dist. Ct. Order at 5). The district court reasoned that "[w]hen a municipality is serving water to a property prior to a rural water district's F[M]HA loan date, the rural water district has no right to serve water to that property, and thus [is entitled to] no 1926(b) protection." Id. at 1101. In addition, the district court held that "[a]pplication of Section 1926(b) protection to customers that were served by the City prior to the June 1994 loan date would constitute an unconstitutional taking." Id.

As for the § 1926 claims based on sales to customers in the deannexed area, the district court rejected those claims by Pitt-7 on three independent grounds:

(1) that the Rooker-Feldman doctrine bars the district court from exercising jurisdiction over the claim; (2) that "exercise of subject-matter jurisdiction to review the Board's deannexation order is also barred by res judicata, collateral estoppel, claim and issue preclusion, and the Full Faith and Credit Act," id. at 1104 n.5; and (3) that "state law adjustment of the boundaries of a rural water district does not fall within the categories of actions that are prohibited by Section 1926(b)." Id. at 1105. As detailed below, we affirm in part and reverse in part the district court's holdings concerning claims arising from sales to Group 3 customers.

## II. DISCUSSION

### Overview

Our review of the district court's ruling proceeds in six parts, (A)-(F). Part (A) holds that the district court erred in concluding that it lacked jurisdiction under the Rooker-Feldman doctrine. Part (B) analyzes the application of issue preclusion, claim preclusion, and full faith and credit to this case, and holds that the district court erred to the extent it held that each of those doctrines barred Pitt-7's suit. In Part (C), we hold that the district court did not violate the law of the case. Part (D) holds that the district court erred in part in applying the applicable statute of limitations. In Part (E), we discuss 7 U.S.C. § 1926 in some

detail and hold that the district court erred in its application of that statute. Finally, Part (F) analyzes the district court's dismissal of Pitt-7's claims for injunctive relief under § 1926, federal antitrust laws, and state antitrust laws to compel McAlester to sell water to Pitt-7 and holds that the dismissal was not error.

## A.      Jurisdiction and   Rooker-Feldman

The district court held that due to the proceedings in the Oklahoma courts, Pitt-7 is precluded by the    Rooker-Feldman   doctrine "from challenging the validity of the final state administrative rulings that removed the [denannexed area] from [Pitt-7's] territory." Aplt's App. at 1104. "The      Rooker-Feldman   doctrine is a jurisdictional prohibition."    Kenmen Eng'g v. City of Union    , 314 F.3d 468, 479 (10th Cir. 2002) (emphasis in original).  We note that this court has previously exercised jurisdiction in this case.  Further, our earlier decision acknowledged, and was decided subsequent to, the county and state court proceedings that were the basis of the district court's    Rooker-Feldman   jurisdictional holding on remand and are the basis of McAlester's jurisdictional arguments on appeal.  Nonetheless, we have an ongoing duty to ensure that our jurisdiction is proper; the right to challenge jurisdiction is not subject to waiver.  We review the district court's holding regarding subject matter jurisdiction de novo.      See id. at 473.

Subject matter jurisdiction generally does not vanish once it properly attaches. See Freeport-McMoRan, Inc. v. K N Energy, Inc., 498 U.S. 426, 428 (1991) ("We have consistently held that if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events."). There are exceptions to this general rule, although none apply to this case. For example, mootness will end jurisdiction where a controversy no longer exists. See Spencer v. Kemna, 523 U.S. 1, 7 (1998). But mootness has not divested the federal courts of jurisdiction in this case; the controversy is alive and well. And, as we now discuss in detail, the proceedings before the Pittsburg Board of County Commissioners concerning deannexation and the subsequent Oklahoma state court decisions did not divest the federal district court of jurisdiction under the Rooker-Feldman doctrine.

In this case, when Pitt-7 filed its initial Complaint in March 1997, the federal district court possessed valid federal question jurisdiction over the federal law claims arising under 42 U.S.C. § 1983, 7 U.S.C. § 1926, and federal antitrust laws. See Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 174 (1997) (reaffirming that a case arises under federal law when "'federal law creates the cause of action or . . . the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law'") (quoting Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 13

(1986)).  The federal district court also had supplemental jurisdiction over the pendent state law antitrust claims to the extent the federal claims survived legal challenge and the district court exercised its discretion to exercise supplemental jurisdiction.   See Chicago , 522 U.S. at 177 (stating that because the district court had original jurisdiction over the plaintiff's claims arising under federal law, the district court "thus could exercise supplemental jurisdiction over the accompanying state law claims so long as those claims constitute 'other claims that . . . form part of the same case or controversy.'") (quoting 28 U.S.C. § 1367(a)).  The jurisdictional question we must resolve  is whether, under the Rooker-Feldman  doctrine, the proceedings in the Pittsburg Board of County Commissioners and the Oklahoma state courts subsequent to the commencement of the federal action operated to divest the federal district court of jurisdiction over this action.

By federal statute, "[f]inal judgments or decrees rendered by the highest court of a State  in which a decision could be had, may be reviewed by the Supreme Court by writ of certiorari."  28 U.S.C. § 1257(a).  The negative inference from this statutory authorization is that "federal review of state court judgments can be obtained only in the United States Supreme Court."     Kenmen , 314 F.3d at 473  (internal quotation marks omitted).  Thus, "     Rooker-Feldman precludes a party losing in state court from seeking what in substance would be

appellate review of a state judgment in a United States district court, based on the losing party's claim that the state court judgment itself violates the loser's federal rights." Id. (internal brackets, ellipses and internal quotation marks omitted).

The Supreme Court has applied the Rooker-Feldman jurisdictional bar to two categories of claims, those (1) actually decided by a state court, see Rooker v. Fid. Trust Co., 263 U.S. 413, 415 (1923); or (2) "inextricably intertwined" with a state court judgment, see Dist. of Columbia Ct. of App. v. Feldman, 460 U.S. 462, 482 n.16 (1983). Plainly, the merits of Pitt-7's claims for relief based on alleged violations of federal water rights law under 7 U.S.C. § 1926 and federal and antitrust law were not actually decided by the Oklahoma district court, which performed no merits analysis and dismissed Pitt-7's appeal due to defective service of process. Whether Pitt-7's federal court claims are "inextricably intertwined" with the Oklahoma state court's judgment is the question that we must resolve.

To apply the "intextricably intertwined" standard, we ask "'whether the injury alleged by the federal plaintiff resulted from the state court judgment itself or is distinct from that judgment.'" Kenman, 314 F.3d at 476 (quoting Garry v. Geils, 82 F.3d 1362, 1365 (7th Cir. 1996)). "In other words, we approach the question by asking whether the state-court judgment caused, actually and proximately, the injury for which the federal-court plaintiff seeks redress."

Kenman , 314 F.3d at 476 (emphasis omitted).  If it did,      Rooker-Feldman   deprives the federal court of jurisdiction; if it did not,      Rooker-Feldman   provides no bar.

Applying that standard, Pitt-7's claims do not result from the state court judgments dismissing, and then affirming that dismissal of, Pitt-7's appeal of the Board of County Commissioners' deannexation for failure to perfect the appeal with proper service.  Rather, Pitt-7's claims of alleged injury arise from (1) sales by McAlester to customers that were within Pitt-7's territorial boundary as of the June 1994 loan from the federal government, when Pitt-7 argues that the protections of 7 U.S.C. § 1926 attached; (2) the specter of McAlester refusing to sell water to Pitt-7 in alleged violation of § 1926 and federal and state antitrust laws; and (3) the act of deannexation by the Board of County Commissioners in alleged violation of Pitt-7's § 1926 rights.  The remedies Pitt-7 seeks –  damages, an injunction, and a declaratory judgment – are not dependent on an overturning in form or substance the state district court's dismissal of Pitt-7's appeal of the deannexation order or the OCCA's affirmance of that decision.

The timing of the deannexation proceedings corroborates this notion: with the exception of the deannexation, which had not yet occurred at the time of the filing of the Complaint and First Amended Complaint, the actions of the defendants that formed the basis of both iterations of the complaint had all been completed prior to the deannexation proceedings.  The core of Pitt-7's claim, even

as pleaded in the Second Amended Complaint, which was filed subsequent to the deannexation, is that McAlester has for years been selling water to certain customers that Pitt-7 claims it has the exclusive right to service under 7 U.S.C. § 1926, an argument the merits of which we address later in this opinion. We thus hold that the Oklahoma state court proceedings provide no bar to Pitt-7's claims under Rooker-Feldman. Accord Kenmen, 314 F.3d at 477 (holding that the claim was barred in part because the plaintiffs sought "monetary damages attributable to losses they sustained as a result of being forced – by state court order – to remove magnesium from their Union City storage facility"). [3]

**B.      Preclusion**

In addition to finding Pitt-7's claims barred by the Rooker-Feldman doctrine, the district court held that its "exercise of subject-matter jurisdiction" is also barred by (1) issue preclusion, (2) claim preclusion and (3) the Full Faith and

---

[3]  See also Charles Wright and Arthur Miller, 18 B Fed. Prac. & Proc. § 4469.1 (2003) ("A decision not on the merits also does not oust federal jurisdiction to decide on the merits."); Whiteford v. Reed, 155 F.3d 671, 674 (3d. Cir. 1998) ("[T]his court has consistently held that where a state action does not reach the merits of a plaintiff's claims, then Rooker-Feldman does not deprive the federal court of jurisdiction.").

Credit Act. Aplt's App. at 1104 n.5. As we now discuss, the district court erred in its application of these three preclusion doctrines.[4]

### 1.    Issue Preclusion

We apply Oklahoma state law to determine the preclusive effect, if any, of the Pittsburg County and Oklahoma proceedings on this federal court action. See McFarland v. Childers, id. at 1185 (10th Cir. 2000). "Under Oklahoma law, 'once a court has decided an issue of fact or law necessary to its judgment, the same parties or their privies may not relitigate the issue in a suit brought upon a different claim.'" Id. at 1185 (quoting Fent v. Okla. Natural Gas Co., 898 P.2d 126, 133 (Okla. 1994)). Here, none of the issues disputed in this federal case were actually decided by the Oklahoma state courts or necessary to their judgments; the state court rulings were essentially limited to determining the propriety of service by Pitt-7 in attempting to perfect its appeal of the deannexation. Thus, under issue preclusion doctrine, the Oklahoma state courts' rulings do not bar Pitt-7's claims in this action.

---

[4] We note also that unlike Rooker-Feldman, none of these doctrines goes to "jurisdiction" as the district court phrased it. Rather, preclusion doctrines provide affirmative defenses once a court exercises jurisdiction over a civil action, and they are subject to waiver where not timely raised. See, e.g., Horwitz v. State Bd. of Med. Exam'rs of State of Colo., 822 F.2d 1508, 1512 (10th Cir. 1987).

Regarding whether issue preclusion flowed directly from the Pittsburg County Board of Commissioners' deannexation order, we note initially that the Board *was* sitting as a quasi-judicial body. Regardless, though, of the resolution of that question, the Board's order does not preclude Pitt-7's claims in this case because it did not resolve the merits of any of the § 1926, federal or state antitrust claims at issue in this action. The Board merely found that the statutory standard for deannexation—that "the granting of the petition is to the best interests of the affected landowners and the district," Okla. Stat. Ann, tit. 82, § 1324.21 – was satisfied, and the Board thus granted the deannexation petition. See Aples' Supp. App. at 355 (Certificate Releasing Lands, issued Jun. 27, 1997). In contrast, the questions before us concern primarily the legality under federal law of sales by McAlester before and after the deannexation to customers within Pitt-7's territorial border as it stood on June 15, 1994, the date Pitt-7 entered into an FMHA loan. Accordingly, issue preclusion flows from neither the proceedings before the Board nor the proceedings before the Oklahoma courts to bar Pitt-7's claims in this case.

### 2. Claim Preclusion

We next analyze whether, under Oklahoma law, the doctrine of claim preclusion bars Pitt-7's claims in this case. We consider the alleged preclusion of

both the deannexation order and the subsequent state court appeal dismissed for lack of jurisdiction. Under Oklahoma law (which does not differ importantly from federal law in its treatment of claim preclusion), "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised *in that action*." Panama Processes, S.A. v. Cities Serv. Co., 796 P.2d 276, 283 n.27 (Okla. 1990) (emphasis in original). The question then is whether the claims raised by Pitt-7 in this action could have been raised and adjudicated on the merits in the proceedings before the Pittsburg Board of County Commissioners and the subsequent appeal of the deannexation Order to the state courts. We conclude that they could not have been.

The administrative proceeding at issue here – the deannexation proceeding – was one of quite limited substantive and remedial scope. Although a party may, as Pitt-7 did, file a petition in such a proceeding opposing deannexation on the ground that deannexation would violate federal law, the applicable standard in such a proceeding is not one established by federal law. Rather, the issue is whether Oklahoma's statutory standard for deannexation is met. Unlike Oklahoma district courts, the Board is not a court of general jurisdiction. Rather, the Board is a state-created agency with a narrow and specific jurisdiction when it comes to water districts, determining whether "the granting of the petition is to the best interests of the affected landowners and the district." Okla. Stat. Ann.,

tit. 82, § 1324.21. That determination is a fact-based, political, and policy-based calculus; it is not on its face one requiring, beyond that one judgment, application of federal or state law.

Thus, in the state administrative proceeding, Pitt-7 could not have "raised" – in the sense of lodging a complaint of law and seeking a legal or equitable remedy – the § 1926, federal antitrust, or Oklahoma antitrust claims at issue in the current suit. Under these circumstances, ordinary claim preclusion principles would not prevent the later assertion of a § 1983 claim (or any other beyond the competence of the Board of County Commissioners) following the Board's determination, even for a claim based on the same set of transactions that led to the deannexation proceeding. See Dority v. Green Country Castings Corp., 727 P.2d 1355, 1360 (stating that "[t]he Restatement (Second) of Judgments [§ 83(3) (1982)] withholds res judicata effect from an agency's adjudicative decision if pursuit of a related claim in another tribunal would not disturb 'the scheme of remedies affordable by the administrative tribunal'"); Restatement (Second) of Judgments § 26(1)(c) (1982) (noting that claim preclusion is inapplicable where a plaintiff is "unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the [administrative tribunal]").

Moreover, the Supreme Court has recognized that "Congress realized that in enacting § 1983 it was altering the balance of judicial power between the state and federal courts," and that "in doing so, Congress was adding to the jurisdiction of the federal courts, not subtracting from that of the state courts." Allen v. McCurry, 449 U.S. 90, 99 (1980) (internal citation and internal quotation marks omitted). Section 1983 was enacted "to afford a federal right in the federal courts." Monroe v. Pape, 365 U.S. 167, 180 (1961), overruled on other grounds, Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658 (1978). "There is no support in § 1983's legislative history for a conclusion that, contrary to traditional claim preclusion principles, an adjudication in a state administrative tribunal of limited jurisdiction should preclude a later § 1983 action in federal court." Dionne v. Mayor and City Council of Baltimore, 40 F.3d 677, 684 (4th Cir. 1994); see also Haring v. Prosise, 462 U.S. 306, 322 n.11 (1983) ("[W]e fail to understand how [judicial economy] interests justify the adoption of a rule that would bar the assertion of [federal law] claims which have never been litigated."); Frazier v. King, 873 F.2d 820, 824 (5th Cir. 1989) (concluding that a rule of claim preclusion "would encourage plaintiffs to bypass administrative proceedings in order to preserve their claims under § 1983"). Indeed, due to Congress's desire to provide a federal forum for the vindication of federal rights,

§ 1983 contains no exhaustion requirement.  <u>Patsy v. Bd. of Regents of State of Fla.</u>, 457 U.S. 496, 516 (1982).

It was therefore wholly proper for Pitt-7 to initiate this federal court action in March 1997 to attempt to vindicate its federal § 1926 and antitrust and pendent state antitrust claims in a federal forum without any predicate state proceedings. Pitt-7 *could* have filed a § 1983 action in state court alleging the § 1926 and antitrust claims at issue in this case.  <u>See, e.g.</u>, <u>Hondo, Inc. v. Sterling</u>, 21 F.3d 775, 780 (7th Cir. 1994) (noting that the plaintiffs in that case "could have brought a § 1983 claim in state court").  However, as was its right under § 1983, Pitt-7 chose a  federal forum to vindicate its federal rights.

Accordingly, we conclude that the district court erred in applying claim preclusion from the Oklahoma proceedings to this case.  We turn now to review the district court's full faith and credit holding.

### 3.    Full Faith and Credit

A judgment of a state court must be accorded "the same full faith and credit in every court within the United States . . . as [it has] by law or usage in the courts of such State.'"  <u>Saavedra v. City of Albuquerque</u>, 73 F.3d 1525, 1534 n.2 (10th Cir. 1996) (quoting 28 U.S.C. § 1738).  As noted above, regarding "the decision of the Board of County Commissioners releasing lands from the water

-26-

district," the OCCA held that "[t]hat decision is final and binding on the water district even if based on erroneous application of federal law. It is not subject to collateral attack or an equitable challenge, such as declaratory relief." Aples' Supp. App. at 210. Thus, the district court was (and is on remand) bound under the full faith and credit statute not to overturn the Board's deannexation.

However, contrary to the district court's holding, the full faith and credit statute does not bar the various claims and remedies sought by Pitt-7 other than striking the deannexation order: neither the Board nor the Oklahoma courts made any holdings on the § 1926 and antitrust claims brought in the instant suit by Pitt-7, nor did any of their judgments foreclose any of the additional remedies sought by Pitt-7. Nor, as we discuss below in our analysis of the merits of Pitt-7's § 1926 claims, did the deannexation order lessen Pitt-7's § 1926 rights. Thus, the district court erred to the extent it held that the claims filed by Pitt-7 were barred by full faith and credit.

## C.   Law of the Case

Pitt-7 argues that the district court's rulings on both the statute of limitations of the § 1926 claim and the merits of the § 1926 claim violated the law of the case. "The 'law of the case' doctrine requires every court to follow the decisions of courts that are *higher* in the judicial hierarchy." Guidry v. Sheet

Metal Workers Int'l Ass'n, Local No. 9, 10 F.3d 700, 705 (10th Cir. 1993) (emphasis supplied). "The doctrine applies to issues previously decided, either explicitly or by necessary implication." Id. "When further proceedings follow a general remand, the lower court is free to decide anything not foreclosed by the mandate issued by the higher court." Id. The law of the case doctrine is "not an inexorable command but a rule to be applied with good sense." Mason v. Texaco, Inc. 948 F.2d 1546, 1553 (10th Cir. 1991) (internal quotation marks omitted). It is "a rule of practice, based upon sound policy that when an issue is once litigated and decided, that should be the end of the matter." Id. (quoting United States v. Smelting Ref. & Mining Co., 339 U.S. 186, 198 (1950)).

Applying those standards, we hold that law of the case did not bar the district court's rulings on remand. Most significantly, nothing in the district court's ruling violated this court's previous Order & Judgment. Further, to the extent that the district court's ruling contradicted the previous district court rulings in this case, two factors counsel that we decline to apply the law of the case bar. First, the remand to the district court was general, stating only that the remand was "for further proceedings consistent with this opinion." Pitt-7, 2000 WL 525992, at **5; see also Mason, 948 F.2d at 1552 ("[W]hen the further proceedings are specified in the mandate the district court is limited to holding[s] such as are directed. When the remand is general, however, the district court is

-28-

free to decide anything not foreclosed by the mandate."). Second, "the purposes of 7 U.S.C. § 1926(b) are to encourage rural water development and to safeguard the interest of the United States in having its loans repaid – both purposes aimed at promoting the public interest." Jennings Water, Inc. v. City of North Vernon, Indiana, 682 F. Supp. 421, 426 (S.D. Ind. 1988), aff'd, 895 F.2d 311 (7th Cir. 1989).

We are therefore reluctant to exercise our discretion under the law of the case doctrine to avoid the merits in a § 1926 case. Cf. id. ("[A]s a matter of law estoppel cannot be involved to subvert the application of a statute enacted in the public interest."). Accordingly, based on our discretion and sound policy considerations, we hold that none of the district court's rulings violated the law of the case.

### D.     Statute of Limitations

Because the district court's statute of limitations rulings present questions requiring the interpretation of federal statutory law, our review is de novo. See Seneca-Cayuga Tribe of Oklahoma v. Nat'l Indian Gaming Comm., 327 F.3d 1019, 1030 (10th Cir. 2003). Regarding the statute of limitations, Pitt-7 argues that the district court's holding that Pitt-7's § 1926 claims were time-barred

conflicts with our decision in <u>Sequoyah County Rural Water Dist. No. 7 v. Town of Muldrow</u>, 191 F.3d 1192 (10th Cir. 1999).

Pitt-7's challenge to the district court's statute of limitations ruling is correct in part. As we now discuss, the district court's ruling that the claims based on the Group 1 customers (those first served by McAlester from July 3, 1967 to February 24, 1989) are time-barred was *not* inconsistent with <u>Sequoyah</u>; however, the ruling that § 1926 claims based on sales to **other** customers are time-barred *was* error under <u>Sequoyah</u>.

Regarding the claims for sales to Group 1 customers, <u>Sequoyah</u> did not reach either the issue of whether the claims were filed within the applicable statute of limitations or whether application of § 1926 would constitute an unconstitutional taking, the key bases for the district court's ruling on the § 1926 claims concerning Group 1 customers. We have noted that "§ 1983 claims are best characterized as personal injury actions," and that therefore "the forum state's personal injury statute of limitations should be applied to all § 1983 claims." <u>Blake v. Dickason</u>, 997 F.2d 749, 750 (10th Cir. 1993) (internal quotation marks omitted). The district court found, and the parties do not dispute, that a two-year statute of limitations applies to the § 1983 action, since that is the limitations period under Oklahoma law for a personal injury cause of action. See Aplt's App. at 1100 n.3; Okla. Stat. Ann. tit. 12, § 95. The original complaint in

this case was filed on March 25, 1997.  Thus, unless there is an applicable exception, all claims that accrued prior to March 25, 1995, are time-barred.

As noted above, it is settled under our previous Order & Judgment in this case that Pitt-7 was "not indebted to [the FMHA] from February 24, 1989, the date of the repurchase, to June 15, 1994, the date of the most recent loan, and [therefore] cannot claim § 1926 protection for this time period."  Pittsburg County, 2000 WL 525942, at **3.  This necessarily means that no violations could have occurred during the period between February 24, 1989, the date the first loan was extinguished, and June 15, 1994, the date Pitt-7 next assumed obligations under the second loan agreement with the FMHA.  Thus, the prior alleged violations could not have been "continuing" between 1989 and 1994; claims based solely on the pre-January 24, 1989 loan period became time-barred in 1991.  This case is thus distinguishable from the case primarily relied on by Pitt-7, Rural Water System # 1 v. City of Sioux Center, Iowa, 967 F.Supp. 1483, 1508 (N.D. Iowa 1997)("Actions that are alleged to be part of this series or pattern of wrongful acts have continued to occur until well within the limitations period."), aff'd, 202 F.3d 1035 (8th Cir. 2000).  The district court thus did not err in dismissing those claims based on alleged pre-March 25, 1995 violations.

In contrast, the district court's ruling on claims based on sales to **other** customers was problematic.  The district court held that "[w]hen a municipality is

serving water to a property prior to a water district's F[M]HA loan date, the rural water district has no right to serve water to that property, and thus, no 1926(b) protection." Aplt's App. at 1101. However, faced with claims identical in structure to the continuing violation claims at issue here (i.e., claims that the municipality violated § 1926 by continuing to provide service during the protected period), Sequoyah authorized a cause of action by a water district that became indebted on an FMHA loan against a municipality where two conditions are satisfied. To prevail under Sequoyah, a water district must demonstrate for the property in question that during the protected period, it (1) was in debt to the federal government through a loan administered by the FMHA and (2) made service available. Sequoyah, 191 F.3d at 1201-05 (analyzing § 1926(b)). Sequoyah held that there existed disputed issues of material fact on the second prong of § 1926 and remanded the case. The fact that a municipality had provided service to those properties prior to the FMHA loan was no bar in Sequoyah to claims arising out of a city's service during the period of indebtedness.

Nothing in our prior Order and Judgment in this case was to the contrary. The district court's ruling conflicts with Sequoyah and was therefore error. Contrary to the district court's ruling, all § 1926 claims based on service by McAlester to customers within the limitations period were not otherwise barred

by the fact that McAlester was serving those customers prior to the 1994 loan.

We turn now to assess the merits of the district court's § 1926 rulings.


**E. Did the district court err on the merits in granting summary judgment on the § 1926 claims?**

We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court. Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, we draw all justifiable inferences in favor of Pitt-7 as the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). We review de novo the district court's determination that Pitt-7's § 1926(b) rights were terminated by the deannexation because it involves an interpretation of federal statutory law. Seneca, 327 F.3d at 1030. We analyze Pitt-7's § 1926 claim in two steps. First, we analyze the rights Pitt-7 possessed under § 1926 prior to the deannexation and conclude that the district court must make findings on remand as to whether Pitt-7 has satisfied the requisite elements. Second, we explain why, *if* Pitt-7 indeed has such § 1926

rights, those rights are enforceable against McAlester for post-deannexation sales to customers in the deannexed area.

### 1. Pitt-7's § 1926 rights from June 15, 1994 up to the Time of the Deannexation

We analyze whether Pitt-7 qualified for § 1926 rights by applying the standards we articulated in Sequoyah. That decision stated that "to receive the protection against competition provided by § 1926(b)[,] a water association must (1) have a continuing indebtedness to the F[M]HA and (2) have provided or made available service to the disputed area." Id. at 1197. The analysis on the first prong is fairly clear: from June 15, 1994 to the present, Pitt-7, undisputedly a water district, has been indebted to the federal government under a loan governed by the terms of § 1926.

On the second prong – whether Pitt-7 has provided or made service available – we are hamstrung in our analysis by the district court's failure to follow our instructions on remand. Our prior Order & Judgment in this case stated that "[w]e . . . reverse and remand because the district court applied the wrong standard to determine whether the District made service available to the disputed customers." 2000 WL 525942, at **4. The Order & Judgment noted that "the district court seems to have limited its examination to [Pitt-7's] ability to provide service today, when a water association meets the pipes-in-the-ground

test by demonstrating that it has adequate facilities within or adjacent to the area to provide service to the area *within a reasonable time* after a request for service is made." Id. (internal quotation marks omitted) (emphasis in original). "At the very least," we stated, "the district court must address the reasonableness of the time estimates on remand." Id.

Unfortunately, the district court on remand did not "address the reasonableness of the time estimates," nor did the district court make *any* findings on whether Pitt-7 has made service available. Rather, the district court rested its conclusion that Pitt-7's § 1926 claims fail on its holding that the actions of McAlester are not those proscribed by § 1926. In doing so, the district court did not resolve the critical threshold question of whether Pitt-7 has made service available, the second prong of the § 1926 eligibility test. This omission was error, and on remand, we reiterate the instructions from our Order and Judgment that the district court make findings on this second prong of the § 1926 test. Specifically, the district court is instructed to, for the dates within the limitations period, analyze for each disputed property whether Pitt-7 made service "available."

**2.     Assuming Pitt-7 is Entitled to § 1926 Protections, May Pitt-7 Assert § 1926 Rights Against McAlester for Post-Deannexation Sales to Customers in the Deannexed Area?**

We turn now to analyze whether, assuming that Pitt-7 was entitled to §1926 protection, the district court correctly held that Pitt-7's § 1926 claim failed because "state law adjustment of the boundaries of a rural water district does not fall within the categories of actions that are prohibited by Section 1926(b)." Aplt's App. at 1105. McAlester argues that the district court's ruling should be upheld because § 1926 does not apply to the acts of the defendants in this case, and that if § 1926 *is* read to apply to the acts of the defendants in this case, that application would violate the Constitution's spending clause, constitute an unconstitutional taking, and eviscerate states' regulatory protections against exorbitant pricing by rural water associations. We address each contention in turn.

**a.     Assuming Pitt-7 Is Entitled to Section 1926 Rights, Does Section 1926 Apply to McAlester's Conduct?**

We first discuss the scope of § 1926 and then apply the statute to McAlester's conduct.

**i.     The Scope of Section 1926**

Section 1926(b) provides that, for an association indebted to the FMHA, "[t]he service provided or made available . . . shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan." 7 U.S.C. § 1926(b). In support of the district court's ruling, McAlester contends that under a literal reading of § 1926, its actions do not violate § 1926 because "[t]o run afoul of Section 1926(b), a municipality must actively compete for the disputed water customer, by moving into the disputed territory through inclusion of the territory within its corporate boundaries." Aples' Br. at 44. Because McAlester did not do so, it maintains that it therefore could not have violated § 1926. Challenging the district court's ruling, Pitt-7 argues that such a literalistic reading of § 1926 is impermissibly narrow under our decisions.

We are persuaded by Pitt-7's argument. We have recognized that "Congress enacted 7 U.S.C. § 1926(b) as part of a federal statutory scheme to extend loans and grants to certain associations providing . . . water service or management . . . or essential community facilities to farmers, ranchers, and other rural residents." Glenpool Util. Servs. Auth. v. Creek County Rural Water Dist. No. 2, 861 F.2d 1211, 1214 (10th Cir. 1988). We have noted that "[d]oubts about whether a water association is entitled to protection from competition under §

1926(b) should be resolved in favor of the F[M]HA-indebted party seeking protection for its territory." Sequoyah , 191 F.3d at 1197. See also North Alamo Water Supply Corp. v. City of San Juan, Tex. , 90 F.3d 910, 915 (5th Cir. 1996) ("The service area of a federally indebted water association is sacrosanct. Every federal court to have interpreted § 1926(b) has concluded that the statute should be liberally interpreted to protect F[M]HA- indebted rural water associations from municipal encroachments.").

Federal courts' broad construction of § 1926(b) reflects the two key goals underlying its enactment. The first was "to provide greater security for the federal loans made under the program." Sequoyah , 191 F.3d at 1196. By "protecting the territory served by such an association facility against competitive facilities, which might otherwise be developed with the expansion of the boundaries of municipal and other public bodies into an area served by the rural system," id. , § 1926 protects the financial interests of the United States, which is a secured creditor of the water association, from reduction of the water association's revenue base. The second interest is the promotion of rural water development "by expanding the number of potential users of such systems, thereby decreasing the per-user cost." North Alamo , 90 F.3d at 915. [5]

---

[5]The Senate Report of the bill that enacted § 1926 stated:

(continued...)

We have noted that § 1926(b) "indicates a congressional mandate that local governments not encroach upon the services provided by [federally indebted water] associations, be that encroachment in the form of competing franchises, new or additional permit requirements, *or similar means*." Glenpool, 861 F.2d at 1214. In light of this congressional mandate, where the federal § 1926 protections have attached, § 1926 preempts local or "state law [that] can be used to justify a municipality's encroachment upon disputed area in which an indebted association is legally providing service under state law." Rural Water Sys. No. 1, 967 F. Supp. at 1529, cited with approval in Sequoyah, 191 F.3d at 1202, 1202 n.8, 1203, and 1204 n.10.

---

[5](...continued)
This section would broaden the utility of this authority [of the Department of Agriculture to aid rural entities] somewhat by authorizing loans to associations serving farmers, ranchers, farm tenants, and other rural residents. This provision authorizes the very effective program of financing the installation and development of domestic water supplies and pipelines serving farmers and others in rural communities. By including service to other rural residents, *the cost per user is decreased and the loans are more secure in addition* to the community benefits of a safe and adequate supply of running household water. A new provision has been added *to assist in protecting the territory served by such an association against competitive facilities, which might otherwise be developed with the expansion of the boundaries of municipal and other public bodies into an area served by the rural system.*

S. Rep. No. 566, 87th Cong., 1st Sess., reprinted in 1961 U.S.C.C.A.N. 2243, 2309 (emphasis supplied).

To the extent that a local or state action encroaches upon the services provided by a protected water association, the local or state act is invalid. See Title Ins. Co. of Minn. v. I.R.S., 963 F.2d 297, 300 (10th Cir. 1992) (noting that "under the Supremacy Clause of the United States Constitution, Article VI, Clause 2, federal law preempts and invalidates state law which interferes with or is contrary to federal law."); Blue Circle Cement, Inc. v. Bd. of County Comm'rs of County of Rogers, 27 F.3d 1499, 1504 n.4 (10th Cir. 1994) ("'[F]or the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws.'") (quoting Hillsborough County v. Automated Med. Lab., Inc., 471 U.S. 707, 713 (1985)). There is thus preemption of any local or state law that purports to take away from an indebted rural water association any territory for which the association is entitled to invoke the protection of § 1926(b).

### ii. Applying § 1926 to McAlester's Conduct

If the district court determines on remand that Pitt-7 meets the two-part test for § 1926 protection regarding the deannexed area, the question becomes whether McAlester's sales to customers in the deannexed area purport to take away from Pitt-7's § 1926 protected sales territory. It is clear that they do. The deannexation, ordered after McAlester and others petitioned the County Board of

Commissioners, was aptly titled "Certificate Releasing Lands from Rural Water District No. 7, Pittsburg County, Oklahoma;" it literally ordered, regarding the designated portions of Pitt-7's territory, that "such lands be released from [Pitt-7]." Aples' Supp. App. at 354-55. McAlester's alleged sales in § 1926-protected territory, subsequent petitioning for the deannexation of a portion of Pitt-7's territory, and commencement of sales to customers in the deannexed area would violate "the congressional mandate that local governments not encroach upon the services provided by [federally indebted water] associations, be that encroachment in the form of competing franchises, new or additional permit requirements, *or similar means*." Glenpool, 861 F.2d at 1214. To read § 1926 otherwise would be inconsistent with the understanding of the statute that we have previously adopted. When § 1926 protection attaches for a water district's service to a property within the water district's territory under the two-part test from Sequoyah, the water district has *exclusive* water service rights over that property until the water district's loan to the FMHA is paid off or the water district fails to make service "available" to the property in question. We thus hold that *if* Pitt-7 was entitled to § 1926 protection, the deannexation order is no

-41-

bar to McAlester's liability and that McAlester's conduct falls within the conduct proscribed by § 1926.[6]

### b. Spending Clause

The district court did not address the Constitution's Spending Clause. McAlester, however, argues that if § 1926 *is* read to apply in this case, that application would exceed the scope of the federal Spending Clause power.

We disagree. The Spending Clause provides that "[t]he Congress shall have Power To . . . provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Section 1926 has been repeatedly upheld as a valid exercise of Congress's authority under the Spending Clause. See, e.g. , Glenpool, 861 F.2d at 1215-16 & 1215 n.1 (explaining that the conditions imposed by § 1926 on Oklahoma municipalities that enter into loan agreements with the FMHA fit comfortably within Congress's spending clause

---

[6] Thus, the § 1926 protections, to the extent Pitt-7 qualified for such protections, were established as of June 15, 1994, and not altered by the deannexation. Federal, not state law, controls the geographic scope of the § 1926 protections, which attach as of the entry into the loan agreement and remain as long as the conditions for § 1926 protection discussed above – FMHA indebtednesss and service "made available" – are met. We therefore need not address the parties' dispute concerning whether under Oklahoma law, water districts may only sell water within the district's borders.

powers because "Oklahoma, through its authorized entity . . . bound itself and all its subdivisions, including [cities], to the conditions it had accepted").

Application of § 1926 to the facts of this case is similarly consistent with the limits of the Spending Clause. "Congress' spending power enables it to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." Kansas v. United States, 214 F.3d 1196, 1198 (10th Cir. 2000) (quoting Fullilove v. Klutznick, 448 U.S. 448, 474 (1980)). There are "four general restrictions on Congress' exercise of power under the Spending Clause." Kansas, 214 F.2d at 1199. "First, Congress's object must be in pursuit of the general welfare." Id. (internal quotation marks omitted). "Second, if Congress desires to place conditions on the states' receipt of federal funds, it must do so unambiguously so that states know the consequences of their decision to participate." Id. "Third, the conditions must be related to the federal interest in the particular program. The required degree of this relationship is one of reasonableness or minimum rationality." Id. (internal citation and quotation marks omitted). "Fourth, there can be no independent constitutional bar to the conditions." Id. "[T]he fourth restriction stands for the more general proposition that Congress may not induce the states to engage in activities that would themselves be unconstitutional." Id.

-43-

The only one of these factors seriously contested by McAlester is the second factor: whether Congress has placed conditions on the receipt of federal funds in loans to rural water districts "unambiguously." McAlester argues that if we apply § 1926 in this case, "the State of Oklahoma would have never had an opportunity to choose not to accept the funds that were borrowed by [Pitt-7] in 1994 . . . Congress will have failed to state the conditions imposed by Section 1926(b) with sufficient clarity." Aples' Br. at 48.

We disagree. The Oklahoma legislature formed the water districts so that the state, through the water districts, could avail itself of the loans made available through § 1926, i.e. "to borrow money from the federal government to accomplish the purposes for which they are established." Sequoyah, 191 F.3d at 1194. Given § 1926's text and the judicial decisions referenced above uniformly announcing and applying a rule of liberal construction to effectuate the statute's purposes, the State of Oklahoma and its subdivisions were on sufficient notice that through their *choice* to borrow money from the federal government, they agreed to abide by § 1926(b)'s proscriptions, including those against shrinking the protected rural water association's service area. We thus reject McAlester's attempt to save the district court's judgment by reference to limits under the Spending Clause.

### c. Takings Clause

Next, McAlester argues that the district court was correct in concluding that "application of § 1926(b) protection to customers that were served by McAlester prior to the June 15, 1994 loan date would constitute an unconstitutional taking." Aples' Br. at 50.[7] We disagree. Application of 7 U.S.C. § 1926 to Group 1 or Group 2 customers decisively does not constitute a taking; indeed, the federal government's loan of several hundred thousand dollars to Pitt-7 as a subdivision of the State of Oklahoma is the near-*opposite* of a taking.

The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. "The aim of the Clause is to prevent the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Eastern Enters. v. Apfel, 524 U.S. 498, 522 (1998) (internal quotation marks omitted). When a regulation adjusts the benefits and burdens of certain economic action to promote the common good, such regulation may in *certain* circumstances effect a taking. See id. at 522-23.

---

[7] McAlester does not advance this argument regarding Group 3 customers, presumably because, since the § 1926 protections would have attached prior to the Group 3 customer sales, there were no customer relationships of McAlester's to "take."

A party challenging governmental action as an unconstitutional taking "bears a substantial burden." Id. at 523. "In light of that understanding," the Supreme Court has stated, "the process for evaluating a regulation's constitutionality involves an examination of the justice and fairness of the governmental action." Id. (internal quotation marks omitted). To aid lower courts engaging in such an examination, the Supreme Court has "identified several factors . . . that have particular significance: the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action." Id. (internal quotation marks omitted).

Applying these three factors compels our holding that no taking is effected in this case by application of § 1926. First, as for economic impact, the regulation in question flowed from an agreement in which the federal government loaned Pitt-7, a political subdivision of the State of Oklahoma, more than $160,000 to aid the water district's development, at an attractive fixed interest rate of five percent.

As for reasonable investment-backed expectations, under § 1926 and the judicial decisions construing that statute, the State of Oklahoma was on sufficiently clear notice that interference with the boundaries of a rural water association during the period that they were protected by § 1926 rights was precluded by law. To the extent McAlester invested in infrastructure on the

assumption that § 1926 was no bar to sales in the deannexed portion, that assumption was not reasonable.

Finally, the character of the imposition of federal law on the state entities in particular confirms the reasonableness of requiring McAlester as a subdivision of the State of Oklahoma to comport with the conditions of § 1926. The requirements of § 1926 flow, not from legislative or executive fiat, but from the entry by a water district – a state subdivision – into an agreement to borrow money from the federal government. The State of Oklahoma was "ultimately free to reject both the conditions and the funding, no matter how hard that choice may be." Kansas, 214 F.3d at 1203. "[O]ffers of conditioned benefits," such as those available to capital-starved rural water associations through preferable loan terms from the federal government, "'expand rather than contract the options of the beneficiary class, and so present beneficiaries with a free choice.'" Id. (quoting Kathleen M. Sullivan, Unconstitutional Conditions, 102 Harv. L. Rev. 1413, 1428 (1989)). In addition, the State of Oklahoma could end the restrictions imposed by § 1926 by paying off Pitt-7's loan and thus ending the period of indebtedness critical to § 1926 protection. We note also that the constraints imposed by § 1926 do not preclude McAlester from selling water. Presumably, McAlester's facilities remain a source of significant revenue: we see no reason why McAlester may not sell water wholesale to Pitt-7 or to nearby suppliers, or retail to customers in non-

§ 1926-protected areas in the vicinity.  For all of these reasons, we conclude that the district court erred in ruling that application of § 1926 to those customers first served by McAlester (Groups 1 and 2) would constitute a taking.

### d. Regulation of Rural Water Districts

The district court read § 1926 not to apply to this case because, in its view, to apply § 1926 to the facts of this case "would limit [the] County Commissioner's ability to release and separate areas from a water district even when it was in the best interests of the landowners and the water district to do so." Aplt's App. at 1104-05.  Similarly, McAlester advances the policy argument that if we decline to recognize the right of a local government to deannex portions of a rural water association protected by § 1926, no regulatory bar will remain to constrain §1926-protected rural water districts from charging excessively high prices.  Although the prospect of such a scenario *would* give us reason to pause, we do not find McAlester's parade of horribles an accurate depiction of the regulatory framework in place before, or after, our decision today.

McAlester relies on the argument in a dissenting opinion to our circuit's holding in <u>Rural Water Dist. No. 1, Ellsworth County, Kan. v. City of Wilson,Kan.</u>, 243 F.3d 1263 (10th Cir. 2001).  The dissent in that case reasoned that rural water customers dissatisfied with high-cost water provided by the

federally sanctioned monopoly water association could file under the Kansas analogue to Oklahoma's deannexation statute for "release of lands from the water districts service area." Id. at 1276 (Briscoe, J., concurring in part and dissenting in part).

However, rural water associations protected by § 1926 *are* subject to price restraints under the threat of losing their § 1926 protection. They are not free at their whim to price monopolistically. As we have stated, "even [if] a rural water district has adequate facilities within or adjacent to the area to provide service to the area within a reasonable time after a request for service is made, the cost of those services may be so excessive that it has *not made those services available* under § 1926(b)." Id. at 1271 (majority) (internal citations and quotation marks omitted) (emphasis supplied). "[I]f the city can show that [the rural water district's] rates or assessments were unreasonable, excessive, and confiscatory," we stated, "then the water district has not made services available under § 1926(b)," and therefore is not entitled to § 1926 protection. Id.

We reaffirm this approach today. This manner of factoring in cost, in addition to being binding circuit law, is a sensible rule as a policy matter. We mitigate the tendency of monopolists to price exorbitantly by conditioning the right to earn the governmentally sanctioned monopolist status on the water association's employing prices that, even if high, are not prohibitive. The

doctrine's aim is to help avoid the unattractive scenario of water remaining unavailable as a practical matter due to excessively high monopolistic pricing without legal recourse for consumers and with no additional market entry by a supplier in sight. We need not define what it means for a price to be "so excessive that it has not made the services available," for the purpose of § 1926 analysis, id. at 1271; that is for the district court to determine on remand, perhaps with the benefit of expert witness testimony on the subject.

We thus reject the argument advanced by McAlester and embraced by the district court that, regardless of the terms of § 1926 agreed to by the State of Oklahoma through the entry into the loan agreement, we must out of deference to state regulatory prerogative refuse to apply § 1926. Such a view reflects "misplaced federalism concerns." United States v. Welch, 327 F.3d 1081, 1093 (10th Cir. 2003).

To recap our § 1926 substantive analysis, we hold, notwithstanding McAlester's arguments under the Spending Clause, the Takings Clause, and regulatory policy concerns, that the rights under 7 U.S.C. § 1926, to the extent they had vested, were not extinguished by the deannexation and are enforceable against McAlester's conduct. The district court erred in holding to the contrary.

Accordingly, we *also* reverse the district court's corollary ruling that Pitt-7 lacked standing to lodge claims relating to the Sherrill property, an issue we

review de novo. Ward v. Utah , 321 F.3d 1263, 1266 (10th Cir. 2003). Given our analysis on the § 1926 claim, Pitt-7 has shown the necessary imminent threat of injury of its § 1926 rights to establish the requisite injury in fact for standing: Sherrill is an entity within the deannexed territory that has requested water service and has asserted that it has the right to deannex and receive water service from an entity other than Pitt-7.

We turn now to review the district court's dismissal of Pitt-7's claims for injunctive relief.


**F.      Did the District Court Err in Dismissing Pitt-7's Claim for Injunctive Relief to Prohibit McAlester from terminating water sales to Pitt-7?**

Pitt-7 sought prospective injunctive relief against McAlester from terminating water sales to Pitt-7 on the grounds that such termination would violate § 1926(b), state antitrust laws, and federal antitrust laws. The district court dismissed Pitt-7's claims for injunctive relief. We review the district court's dismissal de novo. Sutton v. Utah State Sch. for Deaf & Blind , 173 F.3d 1226, 1236 (10th Cir. 1999). As we discuss below, the district court did not err in dismissing the claims for injunctive relief.

## 1.  § 1926(b)

The district court held that "[t]ermination of wholesale water sales to [Pitt-7] is not prohibited" by § 1926.  Aplt's App. at 1109.  On appeal, Pitt-7 argues that the purpose of § 1926 is to maintain the ability of the water district to serve its customers with prices kept relatively low through economies of scale and to ensure the security of the federal government's loan.  Pitt-7 maintains that McAlester's refusal to sell undermines that purpose, for "[t]o read a loophole into the absolute prohibition . . . and allow a city to do via condemnation what it is forbidden by other means, would render nugatory the clear purpose of 1926(b)."  Aplt's Br. at 54 (internal quotation marks omitted).

Although Pitt-7's argument is not without force, it is too far afield from § 1926's text or the decisional law applying § 1926 for us to embrace it.  First, there is nothing in the statute's text concerning a water supplier's refusing to deal with a § 1926-protected water association.  Second, even under the broad reading of § 1926 given by federal courts discussed above,      the inquiry in § 1926 claims has focused on whether the defendant attempted an encroachment through interference with  *boundaries*  or by purporting to  *compete*  with the §1926-protected water district within the protected territory.  Refusal to sell water is clearly not interference with boundaries.  Further, although such refusal might be

-52-

characterized as anti-competitive behavior, it is encroachment through competition, not *anti*-competitive acts, that § 1926 bans.

Moreover, remedies *are* available to challenge unlawful refusals by a supplier to sell a product. To the extent, if any, that Pitt-7 has a claim concerning McAlester's refusal to sell water, that claim sounds in antitrust. <u>See, e.g.</u>, I ABA Section of Antitrust Law, <u>Antitrust Law Developments</u> (5th ed. 2002), at 161 ("Vertical refusals to deal generally arise where a manufacturer refuses to do business with a distributor in the first instance or terminates an existing distributor. . . . Vertical refusals to deal have been challenged as unreasonable trade restraints under . . . the Sherman Act."). We therefore turn to Pitt-7's federal and state antitrust claims.

## 2. Antitrust Claims

Pitt-7 alleges violation of federal and Oklahoma antitrust laws on the theory that McAlester's refusal to sell water to Pitt-7 violates the essential facilities doctrine. The district court dismissed all of Pitt-7's claims for federal and Oklahoma law antitrust violations. The district court found that (1) McAlester was subject to state action immunity from suit on either the federal or state antitrust claim; and, in the alternative, that (2) the antitrust claims failed on the merits because Pitt-7 could not establish the elements necessary to sustain an

essential facilities claim. We decline to address the state action immunity rulings because, as discussed below, Pitt-7's essential facilities claims fail on the merits.

We can comfortably address the merits of Pitt-7's federal and state antitrust claims in tandem under federal antitrust law standards. See Okla Stat. Ann. tit. 79, § 212 (stating that "[t]he provisions of this act shall be interpreted in a manner consistent with Federal Antitrust Law 15 U.S.C., Section 1 et seq. and the case law applicable thereto") (footnote omitted). Under the essential facilities (or "bottleneck") doctrine, "a business or group of businesses which controls a scarce facility has an obligation to give competitors reasonable access to it." Aspen Highlands Skiing Corp. v. Aspen Skiing Corp., 738 F.2d 1509, 1519 (10th Cir. 1984), aff'd, 472 U.S. 585 (1985). There are "four elements necessary to establish liability under the essential facilities doctrine: (1) control of the essential facility by a monopolist; (2) a competitor's inability to duplicate the facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." Id. at 1520. The district court held that Pitt-7 had failed to establish either the first or second element, and therefore dismissed the claim.

Regarding the first prong, the district court held that Pitt-7 "cannot establish that [McAlester] is a monopolist for purposes of the essential facility

doctrine." Aplt's App. at 1108. Three facts persuade us to agree. First, Pitt-7 has represented in filings to the federal government that it has "a suitable available alternative water supply" to McAlester. [8] Second, Pitt-7 has conceded that there exist other water treatment plants besides McAlester's in Pittsburg county and its environs. Aplt's App. at 939 (Dep. of William Hegdale, former Pitt-7 Board member, dated May 21, 1999). Third, Pitt-7 has stated that it could duplicate the facility operated by McAlester by constructing its own collection and treatment facility by as early as April 2004. See id. at 850.

Because we conclude that the first prong was not satisfied, we need not address the other required elements of the essential facilities test. We conclude that the district court correctly dismissed Pitt-7's antitrust claims.

### III. CONCLUSION

We hold that the district court (1) erred in concluding that it lacked jurisdiction under the Rooker-Feldman doctrine; (2) erred in applying issue preclusion, claim preclusion, and full faith and credit; (3) did not err under the law of the case; (4) erred in part in applying the statute of limitations; (5) erred in

---

[8] Aplt's App. at 819 (Brief in Support of Motion of Defendants City of McAlester and the McAlester Public Works Authority for Partial Summary Judgment (Statement of Undisputed Facts), filed March 30, 2001); id. at 849 (Plaintiff's Response to McAlester's Motion for Partial Summary Judgment (Response to McAlester's Statement of Undisputed Facts), filed April 13, 2001).

its application of § 1926; and (6) did not err in dismissing Pitt-7's claims for injunctive relief under 7 U.S.C. § 1926, federal antitrust laws, and state antitrust laws. We therefore AFFIRM IN PART, REVERSE IN PART, AND REMAND TO THE DISTRICT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.